UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**04 10848 DPW**

| | | |
|---|---|---|
| THE BLACK & DECKER CORPORATION, BLACK & DECKER, INC., BLACK & DECKER (U.S.) INC., EMHART CORPORATION, and EMHART INDUSTRIES, INC., | ) ) ) ) ) | CIVIL ACTION NO. |
| Plaintiffs, | ) ) | MAGISTRATE JUDGE Cohen |
| v. | ) ) | |
| LIBERTY MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

RECEIPT # ___
AMOUNT $ N/A
SUMMONS ISSUED N/A
LOCAL RULE 4.1 ___
WAIVER FORM ___
MCF ISSUED ___
BY DPTY CLK ___
DATE ___

**COMPLAINT AND JURY CLAIM**

PRELIMINARY STATEMENT

Plaintiffs, The Black & Decker Corporation, Black & Decker Inc., Black & Decker (U.S.) Inc., Emhart Corporation and Emhart Industries, Inc. ("Black & Decker"), file this Complaint pursuant to the March 19, 2004 and April 8, 2004 Orders in Liberty Mutual Insurance Co. v. The Black & Decker Corp., et als., Civil Action No. 96-10804-DPW. Those Orders require, inter alia, that the Black & Decker counterclaim alleging that the conduct of Liberty Mutual was in violation of Mass. Gen. Laws c. 93A and in breach of its obligation of good faith, originally filed in Civil Action No. 96-10804-DPW, be filed in a new action that relates back to Civil Action No. 96-1084-DPW.

Plaintiffs, The Black & Decker Corporation, Black & Decker Inc., Black & Decker (U.S.) Inc., Emhart Corporation and Emhart Industries, Inc., for their Complaint, allege as follows:

## Parties

1. Plaintiff, The Black & Decker Corporation ("BDC"), is a corporation organized under the laws of the State of Maryland, having its principal place of business in Towson, Maryland.

2. Plaintiff, Black & Decker Inc. ("BDI"), is a corporation organized under the laws of the State of Delaware, having its principal place of business in Newark, Delaware.

3. Plaintiff, Black & Decker (U.S.) Inc. ("BDUS"), is a corporation organized under the laws of the State of Maryland, having its principal place of business in Towson, Maryland.

4. Plaintiff, Emhart Corporation ("Emhart"), is a corporation organized under the laws of the State of Virginia, having its principal place of business in Towson, Maryland. Emhart is a wholly-owned subsidiary of BDI.

5. Plaintiff, Emhart Industries, Inc. ("EII"), is a corporation organized under the laws of the State of Connecticut, having its principal place of business in Towson, Maryland. EII is a wholly-owned subsidiary of Emhart.

6. Plaintiffs (collectively and individually "Black & Decker") are informed and believe, and therefore aver, that defendant, Liberty Mutual Insurance Company ("Liberty Mutual"), is an insurance company organized under the laws of the Commonwealth of Massachusetts, having its principal place of business in Boston, Massachusetts. Liberty Mutual is engaged in the business of issuing contracts of liability insurance.

## Jurisdiction and Venue

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 in that plaintiffs and defendant are citizens of different states and the amount in controversy, exclusive of costs and interest, exceeds the sum or value of $75,000.

2

8. Venue lies in this Court pursuant to 28 U.S.C. § 1391(a).

### Facts

A. Corporate History

9. BDC was founded in Towson, Maryland in 1910. Since its founding, BDC has been headquartered in Towson and has been engaged in a number of businesses, including the manufacture and sale of power tools and home appliances.

10. BDI is a wholly owned subsidiary of BDC. In 1989 BDI purchased the outstanding capital stock of, and merged with, Emhart.

11. USM Corporation ("USM") was incorporated in New Jersey in 1905. Thereafter, it was engaged in the manufacture and sale of shoe machinery equipment and supplies. USM was merged with and into an Emhart subsidiary in 1976, and was merged into EII in 1987.

12. Farrel Company, also known as Farrel Corporation ("Farrel"), was formed in 1857 and was later incorporated under the laws of the state of Connecticut. Farrel was a manufacturer of equipment used in the paper, rubber and plastics industries and had manufacturing facilities in Ansonia and Derby, Connecticut. Farrel was merged with and into USM in 1968.

13. MITE Corporation ("MITE") was incorporated in Delaware in 1961. It merged with and into a wholly owned subsidiary of Emhart effective December 31, 1986.

14. PCI Group, Inc. ("PCI") was incorporated under the laws of the Commonwealth of Massachusetts. It was engaged in the manufacture and sale of tacks, nails, eyelets, shanks, shoe supplies and industrial fasteners. USM purchased the capital stock of PCI on January 29, 1982. In accordance with a complete plan of liquidation, effective January 1, 1985, all of the assets of PCI were transferred to USM.

B.  The Insurance Policies

15. Liberty Mutual issued general liability policies to BDC ("BDC General Liability Policies"), from 1937 through July 1, 1979 and issued umbrella excess liability insurance policies to BDC ("BDC Excess Policies") from July 1, 1967 through July 1, 1978. The term and policy number of each of the BDC General Liability Policies and BDC Excess Policies are set forth in Section I of Exhibit A to this Complaint and those policies, separately and collectively, will be referred to as the BDC Policies.

16. Liberty Mutual issued general liability policies to USM ("USM General Liability Policies"), from 1918 through January 1, 1979 and issued umbrella excess liability insurance policies to USM ("USM Excess Policies") from January 21, 1966 through January 1, 1979. The term and policy number of each of the USM General Liability Policies and USM Excess Policies are set forth in Section II of Exhibit A to this Complaint and those policies, separately and collectively, will be referred to as the USM Policies.

17. Liberty Mutual issued general liability policies to Farrel ("Farrel General Liability Policies"), from 1918 through November 1, 1971 and issued umbrella excess liability insurance policies to Farrel ("Farrel Excess Policies") from February 19, 1962 through July 1, 1969. The term and policy number of each of the Farrel General Liability Policies and Farrel Excess Policies are set forth in Section III of Exhibit A to this Complaint and those policies, separately and collectively, will be referred to as the Farrel Policies.

18. Liberty Mutual issued general liability policies to MITE ("MITE General Liability Policies"), from January 1, 1971 through January 18, 1983, from January 1, 1985 through June 27, 1985 and from January 1, 1986 through January 1, 1988 and issued umbrella excess liability insurance policies to MITE ("MITE Excess Policies") from January 1, 1971

through June 27, 1985 and from January 1, 1986 through January 1, 1988. The term and policy number of each of the MITE General Liability Policies and MITE Excess Policies are set forth in Section IV of Exhibit A to this Complaint and those policies, separately and collectively, will be referred to as the MITE Policies.

19. Liberty Mutual issued general liability policies to PCI ("PCI General Liability Policies"), from October 1, 1979 through October 1, 1982 and issued umbrella excess liability insurance policies to PCI ("PCI Excess Policies") from October 1, 1979 through March 1, 1982. The term and policy number of each of the PCI General Liability Policies and PCI Excess Policies are set forth in Section V of Exhibit A to this Complaint and those policies, separately and collectively, will be referred to as the PCI Policies.

20. Black & Decker has succeeded to the rights and interests of USM, Farrel, MITE and PCI under the insurance policies issued to each of those entities by Liberty Mutual. The insurance policies that are the subject of the preceding paragraphs will separately and collectively be referred to as the Policies.

21. Under the Policies, Liberty Mutual has a duty to defend Black & Decker against, and indemnify Black & Decker for, losses suffered due to covered accidents and occurrences as defined in said Policies.

22. Black & Decker is informed and believes, and therefore avers, that the aggregate amount of indemnification that Liberty Mutual is obligated to provide Black & Decker under the Policies is in excess of $300,000,000.

23. Under the Policies, Liberty Mutual has a duty to provide Black & Decker with a defense of claims within the scope of the coverage. Under certain of the Policies, the Liberty Mutual duty to defend Black & Decker exists even if the policy limits for indemnification have

5

been exhausted. Under the remaining Policies, the Liberty Mutual duty to defend Black & Decker exists until the policy limits for indemnification have been exhausted.

24. The Policies provide Black & Decker coverage with respect to, inter alia, claims concerning alleged contamination of the environment ("Environmental Claims") and claims concerning alleged injury caused by long-term exposure to Black & Decker's products or facilities ("Long-Term Exposure Claims"). Black & Decker has provided Liberty Mutual with notice of numerous claims that are within the scope of the coverage provided by the Policies and Liberty Mutual has frequently denied, or paid only a portion of, defense and/or indemnification for such claims, notwithstanding that there was no reasonable basis, in view of the facts and law and the provisions of the applicable Policies, for denying coverage.

### C. Summary Of Allegations

25. This action arises out of a series of unlawful actions that Liberty Mutual took in an attempt to deprive Black & Decker of the benefits of hundreds of millions of dollars of coverage under the insurance policies that Liberty Mutual had issued to Black & Decker. Black & Decker is informed and believes, and therefore avers, that Liberty Mutual was motivated by a desire to avoid the obligations it assumed by issuing the Policies to Black & Decker and that it sought to do so by "buying back" those Policies.

26. Liberty Mutual sought to coerce Black & Decker to relinquish its rights in the Policies. The actions that Liberty Mutual took as part of its coercive strategy included, inter alia, (1) failing to pay amounts it had agreed to pay to resolve specific claims, (2) failing to pay claims as to which its liability was clear, (3) using a settlement agreement in one lawsuit as a pretext to cease performing obligations in connection with other claims submitted by its policyholders, (4) instigating unwieldy, unnecessary and expensive litigation as a tool to attempt

to coerce its policyholders to surrender rights under insurance policies, and (5) withholding payment on claims in which its liability was clear in an attempt to influence settlement of other claims.

27. In addition to the unlawful strategy of attempting to "buy back" the benefits of its Policies, the conduct of Liberty Mutual in handling specific claims submitted by Black & Decker includes actions that are proscribed as unfair claims settlement practices in state statutes regulating the conduct of insurers, including Mass. Gen. Laws c. 176D and the Connecticut Unfair Insurance Practices Act, C.G.S.A. § 38a-815 et seq. Such actions included, inter alia, failing to consider each claim on an individual basis, failing to act promptly in response to claims, denying claims without conducting reasonable investigations, failing to pay claims in which its liability was clear and denying claims without a reasonable basis in the Policies, in relation to the facts and the applicable law.

28. After agreeing to a settlement process and obtaining substantial information from Black & Decker, Liberty Mutual acted in breach of its obligations by, inter alia, (a) failing to discharge its obligation to respond to the information provided by Black & Decker, (b) misusing the information to formulate a lawsuit, rather than proceeding in the settlement process, (c) concealing from Black & Decker the existence of the lawsuit that Liberty Mutually improperly filed, (d) failing to act in good faith and properly to exercise its duties as insurer upon receipt of the information from Black & Decker in connection with the settlement process and (e) insisting on being given an opportunity to make a settlement offer before the commencement of litigation and then surreptitiously commencing litigation without making a settlement offer or advising Black & Decker that it had decided not to make a settlement offer.

### D. The Liberty Mutual Strategy Regarding Environmental And Long-Term Exposure Claims

29. Black & Decker is informed and believes, and therefore avers, that beginning in or about 1970, Liberty Mutual decided to change its comprehensive general liability insurance policies and its excess general liability policies so as to reduce, and ultimately eliminate, the coverage that such policies provided with respect to Environmental Claims and Long-Term Exposure Claims.

30. Black & Decker is informed and believes, and therefore avers, that, over a period of years, the steps that Liberty Mutual took as part of this effort included adding the so-called sudden and accidental pollution exclusion, and thereafter, the absolute pollution exclusion to its insurance policies, adding asbestos exclusions to its insurance policies and ceasing to write insurance policies that provide occurrence-based coverage.

31. Black & Decker is informed and believes, and therefore avers, that Liberty Mutual became concerned about the cost of discharging its obligations to policyholders to whom it had issued insurance policies that provide coverage with respect to Environmental Claims and Long-Term Exposure Clams, including its obligations under insurance policies that did not contain pollution exclusions.

32. Black & Decker is informed and believes, and therefore avers, that Liberty Mutual sought to deprive its insureds of the benefits to which they were entitled under insurance policies that provided coverage for Environmental Claims and Long-Term Exposure Claims.

33. Black & Decker is informed and believes, and therefore avers, that, in order to avoid its obligations to policyholders, Liberty Mutual decided to deny the existence of, and/or destroy, insurance policies that it had issued prior to 1970 and then falsely to assert that such policies did not exist. In so doing, it sought to impose a burden on its insureds to produce

evidence concerning the existence and terms of insurance policies that Liberty Mutual knew it had issued.

34. Black & Decker is informed and believes, and therefore avers, that Liberty Mutual adopted an unlawful strategy of attempting to coerce its insureds to relinquish their rights under insurance policies that provided coverage with respect to Environmental Claims and Long-Term Exposure Claims. The goal of Liberty Mutual was to "buy back" insurance policies it had issued, rather than to honor its obligation to indemnify and defend insureds with respect to specific claims for which its policies provided coverage.

35. Black & Decker is informed and believes, and therefore avers, that the unlawful strategy that Liberty Mutual employed included the creation of special departments to handle Environmental Claims and Long-Term Exposure Claims, rather than having such claims processed in the same manner as all other claims submitted by policyholders. One such special department was the so-called Declaratory Judgment Department.

36. Black & Decker is informed and believes, and therefore avers, that with the creation of the Declaratory Judgment Department, Liberty Mutual stopped handling Environmental Claims on a claim-by-claim basis as those claims arose.

37. Black & Decker is informed and believes, and therefore avers, that, in a scheme to protect and increase its profits, Liberty Mutual, acting in bad faith and with the knowing and deliberate intent to deprive policyholders of the benefit of policies they had purchased, created the Declaratory Judgment Department and took other steps by which Environmental Claims and Long-Term Exposure Claims were not considered on their merits to the detriment of their insureds, including Black & Decker.

38. Black & Decker is informed and believes, and therefore avers, that Liberty Mutual created its Declaratory Judgment Department to force insureds to litigate Environmental Claims and Long-Term Exposure Claims in order to obtain the benefits to which Liberty Mutual knew the insureds were entitled. Liberty Mutual sought to impose expensive litigation costs on insureds with the hope that it could, through the pendency of litigation, coerce its insureds to relinquish insurance policies. It attempted to create unwieldy mega-litigation in an attempt to coerce its insureds to relinquish their rights regarding specific claims and to relinquish the insureds' rights under the applicable policies with respect to future claims.

39. Black & Decker is informed and believes, and therefore avers, that during litigation Liberty Mutual used mediation and settlement negotiations to make demands on its policyholders that it could not lawfully assert in other forums, including proposals to buy back insurance policies, rather than honor its obligations with respect to particular claims submitted by its insureds. Black & Decker is informed and believes, and therefore avers, that such proposals are unlawful, but that Liberty Mutual attempted to shield its unlawful conduct by attempting to use settlement negotiations and/or mediation during litigation to insulate it from its obligations as an insurer to act in good faith in handling and settling claims.

### E. The Unlawful Liberty Mutual Conduct Regarding Black & Decker Environmental Claims Prior To January 1, 1995

40. Liberty Mutual improperly denied coverage with respect to numerous Environmental Claims submitted by Emhart and EII (collectively "Emhart"). As a result of such conduct, in 1990 Emhart commenced a civil action against Liberty Mutual and other insurers arising out of the unjustified refusal of the insurers to discharge their obligations to provide coverage with respect to certain Environmental Claims ("1990 Coverage Action"). The complaint in that action, as amended, alleged that Liberty Mutual failed to provide coverage with

10

respect to Environmental Claims arising out of the alleged involvement of Emhart with twelve sites in Massachusetts, Michigan, New Hampshire and Vermont.

41.   Black & Decker is informed and believes, and therefore avers, that, during the pendency of the 1990 Coverage Action, Liberty Mutual embarked on a policy unlawfully to avoid its obligations in connection with Environmental Claims that were not at issue in the 1990 Coverage Action.

42.   During the pendency of that action, Liberty Mutual received a number of Environmental Claims from Black & Decker regarding matters that were not at issue in the 1990 Coverage Action. It either denied coverage for, or failed to advise Black & Decker of its coverage position regarding, the Black & Decker Environmental Claims concerning the following sites, to which it was alleged that waste from Black & Decker facilities had been transported ("Superfund Claims"): A-1 Disposal in Plainwell, Michigan; Beacon Heights Landfill in Beacon Falls, Connecticut; Bridgeport Rental and Oil Services ("BROS") in Bridgeport, New Jersey; Berks Landfill in Douglassville, Pennsylvania; Huth Oil in Cleveland, Ohio; Jaffrey Sanitary Landfill in Jaffrey, New Hampshire; Laurel Park in Naugatuck, Connecticut; Old Southington Landfill in Southington, Connecticut; Shaffer Landfill in Billerica, Massachusetts; Simpsonville Hazardous Waste Site in Simpsonville, South Carolina and Solvent Recovery Services of New England ("SRSNE") in Southington, Connecticut. In so doing, it acted without conducting a reasonable investigation.

43.   During the pendency of the 1990 Coverage Action, Liberty Mutual received a number of Environmental Claims from Black & Decker regarding old industrial sites at which Black & Decker had allegedly conducted manufacturing operations ("Old Industrial Sites") that were not at issue in the 1990 Coverage Action. It either denied coverage for, or failed to advise

Black & Decker of its coverage position regarding, the Black & Decker Environmental Claims concerning the following Old Industrial Sites: the Bostik facilities in Middleton, Massachusetts and Marshall, Michigan; the Dudley & Eddy facility in Providence, Rhode Island; the Farrel facilities in Ansonia and Derby, Connecticut; the BDC facility in Hampstead, Maryland; the Harmonic Drive facility in Wakefield, Massachusetts; the SHW facility in Ansonia, Connecticut; and the WW Cross facility in Jaffrey, New Hampshire. In so doing, it acted without conducting a reasonable investigation.

44. Liberty Mutual failed to respond to some or all of the above-mentioned claims in a timely manner. When it did respond to those claims, it purported to deny coverage on bases that were not reasonable in view of the facts and the law. The unreasonable bases that Liberty asserted for denying coverage included the purported "manifestation trigger," that proceedings under CERCLA and similar state statutes were not "suits," that the cost of environmental remediation were not "damage" or "property damage," and that late notice, in the absence of prejudice, barred coverage. The Liberty Mutual responses included reliance on the pollution exclusion notwithstanding the numerous applicable policies that it issued which did not contain pollution exclusions. Liberty Mutual ignored numerous policies that it issued that were applicable to the claims and which clearly provided coverage.

45. During the pendency of the 1990 Coverage Action, Liberty Mutual advised Black & Decker that it would no longer honor its agreement to pay a portion of Black & Decker's defense costs in connection with the Beacon Heights and Laurel Park Environmental Sites.

46. Prior to the commencement of the 1990 Coverage Action, Liberty Mutual agreed to pay Black & Decker's defense and indemnification costs in connection with the so-called PAS

Oswego site. However, during the pendency of that action, Liberty Mutual ceased paying those costs without advising Black & Decker of its intention not to honor its agreement.

47.  Black & Decker is informed and believes, and therefore avers that, due to the pendency of the 1990 Coverage Action, Liberty Mutual failed to handle the claims asserted by Black & Decker on their merits, but, instead, suspended normal claims handling due to the litigation.

    F.    The Unlawful Liberty Mutual Conduct Regarding Black & Decker Long-Term Exposure Claims Prior To January 1, 1995

48.  Black & Decker is informed and believes, and therefore avers, that during the pendency of the 1990 Coverage Action, Liberty Mutual embarked on a policy unlawfully to avoid its obligations in connection with Long-Term Exposure Claims.

49.  In or about August 1991, Black & Decker provided Liberty Mutual notice of a Long-Term Exposure Claim in which employees of a tire manufacturing plant in Texarkana, Arkansas alleged that they had suffered hearing loss as a result of exposure to products manufactured by Farrel ("Arkansas Hearing Loss Claim"), as well as due to products manufactured by other corporations.

50.  Liberty Mutual was obligated to defend Black & Decker with respect to the Arkansas Hearing Loss Claim pursuant to the Farrel Policies, including the Farrel Policies for the years 1964 through 1971 ("1964-71 Farrel Policies").

51.  After it received notice of the Arkansas Hearing Loss Claim, Liberty Mutual falsely asserted that it had not issued the 1964-71 Farrel Policies and that Black & Decker was uninsured during the terms of those policies. It insisted that Black & Decker pay 27% of the defense costs for the Arkansas Hearing Loss Claim, a percentage attributable to the purported non-existence of the 1964-71 Farrel Policies.

52. Liberty Mutual knew that it had issued the 1964-71 Farrel Policies, but falsely denied the existence of those policies, although those policies were in Liberty Mutual's files. As a result of the Black & Decker insistence that Liberty Mutual had issued the 1964-71 Farrel Policies and an Order of this Court, Liberty Mutual ultimately admitted that it had issued each of those policies and provided copies of those policies to Black & Decker.

53. In or about August 1991, Black & Decker provided Liberty Mutual notice of a Long-Term Exposure Claim in which employees of a shipyard in Pascagoula, Mississippi alleged that they had suffered hearing loss as a result of exposure to products manufactured by Black & Decker ("Mississippi Hearing Loss Claim"), as well as due to products manufactured by other corporations.

54. Liberty Mutual was obligated to defend Black & Decker with respect to the Mississippi Hearing Loss Claim pursuant to the BDC Policies, including the BDC Policies for the years 1964 through 1970 ("1964-70 BDC Policies").

55. Liberty Mutual falsely asserted that it had not issued the 1964-70 BDC Policies and that Black & Decker was uninsured during the terms of those policies. It insisted that Black & Decker pay 33.5% percent of the defense costs for the Mississippi Hearing Loss Claim, a percentage attributable to the purported non-existence of the 1964-1970 BDC Policies. Liberty Mutual asserted that it would pay 37.5% of the defense costs of the Mississippi Hearing Loss Claim. In March 1994, Liberty Mutual made a payment for defense costs in connection with the Mississippi Hearing Loss Claim, but made no further payment until February 2002, although during the period of non-payment, Black & Decker continued to incur defense costs in that claim.

56. In or about February 1994, Black & Decker provided Liberty Mutual notice of a Long-Term Exposure Claim in which employees of a shipyard in Pascagoula, Mississippi alleged that they had suffered injuries to their hands and arms as a result of vibrations associated with products manufactured by Black & Decker ("Mississippi Hand/Arm Vibration Claim"), as well as due to products manufactured by other corporations.

57. After receiving notice of the Mississippi Hand/Arm Vibration Claim, Liberty Mutual did not defend Black & Decker in connection with that claim and subsequently asserted that it had not issued the 1964-70 BDC Policies and that Black & Decker was uninsured during the terms of those policies.

G. The 1995 Agreement

58. Liberty Mutual entered into an agreement with Emhart, dated January 23, 1995, to resolve the 1990 Coverage Action ("1995 Agreement"). At the time of the 1995 Agreement, Liberty Mutual had failed to provide coverage, or failed to provide complete coverage, with respect to numerous claims submitted by Black & Decker that were not at issue in the 1990 Coverage Action ("Unresolved Claims") and with respect to which Black & Decker was entitled to coverage. The Unresolved Claims included the Arkansas Hearing Loss, Mississippi Hearing Loss and Mississippi Hand/Arm Vibration Long-Term Exposure Claims as to which there was no dispute, or no reasonable basis for a dispute, over Liberty Mutual's obligation to provide Black & Decker with a defense, and, if necessary, indemnification. The Mississippi Hearing Loss and Mississippi Hand/Arm Vibration Long-Term Exposure Claims had been filed on behalf of an insured other than Emhart.

59. The Unresolved Claims also included Environmental Claims on behalf of Black & Decker, other than those at issue in the 1990 Coverage Action, among them claims as to which

Liberty Mutual did not assert, or had no reasonable basis to assert, that it had no duty to indemnify and/or defend, including claims concerning the A-1 Disposal, Beacon Heights, BROS, Douglassville, Huth Oil, Jaffrey Sanitary Landfill, Laurel Park, Old Southington Landfill, Shaffer Landfill, Simpsonville and SRSNE Superfund Sites and claims concerning the Bostik, Beverly, Dudley & Eddy, Farrel, Hampstead, Harmonic Drive, SHW and WW Cross Old Industrial Sites.[1]

    60.    Black & Decker is informed and believes, and therefore avers, that, prior to entering into the 1995 Agreement, Liberty Mutual adopted an unlawful scheme to avoid its lawful obligations as an insurer with respect to the Unresolved Claims, whereby it embarked upon a negotiating strategy to impose an unlawful agreement under which:

    a.    Black & Decker (including Black & Decker entities that were not parties to the 1990 Coverage Action) would relinquish its rights to prompt and proper handling, on an individual basis, of each Long-Term Exposure Claim under the Policies and to a defense and/or indemnification in accordance with the terms of the Policies and/or immediate payment of covered claims; and

    b.    Black & Decker (including Black & Decker entities that were not parties to the 1990 Coverage Action) would relinquish its rights to prompt and proper handling, on an individual basis, of each Environmental Claim under the Policies and to a defense and/or indemnification in accordance

---

[1] With respect to the Beverly and Jaffrey Sanitary Landfill claims, it was later ruled that Liberty Mutual was entitled to deny coverage but for reasons that Liberty Mutual had not contemporaneously asserted to Black & Decker. Liberty Mutual had not even considered the Policies applicable to Jaffrey Sanitary Landfill.

with the terms of the Policies and/or immediate payment of covered claims.

61. Black & Decker is informed and believes, and therefore avers, that in pursuit of this unlawful strategy, Liberty Mutual unlawfully insisted, in derogation of its lawful obligations as an insurer, as a condition for settling the 1990 Coverage Action, that Black & Decker agree to forbear from instituting or filing civil actions against Liberty Mutual arising out of the failure of Liberty Mutual to honor its insurance coverage obligations with respect to all Unresolved Claims ("Forbearance Provision").

62. The Forbearance Provision purported to maintain the status quo with respect to Long-Term Exposure Claims, with respect to claims under Policies by insureds who were non-parties to the 1990 Coverage Action and with respect to Environmental Claims which were not at issue in the 1990 Coverage Action, including claims as to which there was no dispute, or no reasonable basis for a dispute, over Liberty Mutual's obligation to provide a defense and/or indemnification.

63. At the time of the Forbearance Provision, Black & Decker was continuing to incur defense costs in connection with the Arkansas Hearing Loss, Mississippi Hearing Loss and Mississippi Hand/Arm Vibration Claims. At that time, Liberty Mutual:

  a. was not paying at least the portion of defense costs in the Arkansas Hearing Loss Claim attributable to the 1964-71 Farrel Policies,

  b. was not paying the portion of the defense costs in the Mississippi Hearing Loss Claim attributable to the 1964-70 BDC Policies,

  c. was not even paying the percentage of defense costs in the Mississippi Hearing Loss Claim that it had agreed to pay, and

17

   d.  was not paying any of the defense costs in the Mississippi Hand/Arm Vibration Claim.

64. At the time Liberty Mutual imposed the Forbearance Provision, Black & Decker was continuing to incur substantial costs with respect to the Bostik, Farrel, WW Cross and Whitman Environmental Claims as to which Liberty Mutual had no reasonable basis for failing to defend and/or indemnify Black & Decker. However, by virtue of the Forbearance Provision, Black & Decker was unable to pursue its rightful claim that Liberty Mutual perform its obligations under the Policies.

65. After obtaining the Forbearance Provision, and under cover of that Provision, rather than complying with its legal obligations to the insureds, Liberty Mutual embarked upon a further unlawful course of conduct designed to further delay and to avoid the performance of its lawful obligations under Policies it issued to Black & Decker.

66. The Forbearance Provision provided, _inter alia_, that Black & Decker furnish Liberty Mutual information that it purportedly needed to evaluate the Unresolved Claims and that Liberty Mutual would so evaluate the claims within one month and make a proposal to resolve the Unresolved Claims.

67. Liberty Mutual sent Black & Decker a letter dated January 26, 1995 ("January 1995 Letter"), purporting to request, pursuant to the 1995 Agreement, information to evaluate the Unresolved Claims.

68. The January 1995 Letter sought extensive information that was not reasonably required to evaluate the Unresolved Claims. The January 1995 Letter was an attempt by Liberty Mutual to impose an unreasonable task upon Black & Decker, which would require substantial time and expense, so as to delay disposition of the Unresolved Claims and to perpetuate a _status_

quo in which Liberty Mutual could, with perceived impunity, avoid its obligations under the Policies, while, pursuant to the Forbearance Provision, Black & Decker was precluded from seeking enforcement of Liberty Mutual's obligations.

69.   Nevertheless, Black & Decker acceded to Liberty Mutual's request and proceeded in good faith, and at considerable cost and expense, to respond to the burdensome requests contained in the January 1995 Letter. It provided the information requested in a letter dated September 12, 1995 ("September 1995 Letter").

70.   After receiving the September 1995 Letter, Liberty Mutual acted in breach of its obligations, pursuant to the 1995 Agreement, by, inter alia, not making a substantive proposal concerning the Unresolved Claims.

71.   The 1995 Agreement provided that the Forbearance Provision would expire on May 1, 1995. The Forbearance Provision was extended on several occasions and expired on January 1, 1996.

72.   Black & Decker did not agree to Liberty Mutual's request further to enlarge the forbearance period due, inter alia, to Liberty Mutual's failure to make a substantive proposal concerning the Unresolved Claims and Liberty Mutual's insistence on extending the forbearance period for the Long-Term Exposure Claims, as well as the Environmental Claims.

H.   The Improper Filing Of The 1996 Action

73.   On January 2, 1996, after having used the Forbearance Provision to prevent Black & Decker from making lawful claims against it over a period of approximately one year, and while purporting to continue its negotiations with Black & Decker, and after receiving substantial information from Black & Decker, Liberty Mutual, without giving prior notice to Black & Decker, commenced a declaratory judgment action against Black & Decker in Suffolk